THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JUAN TURCIOS, Defendant-Appellant.

Second District   No. 2—90—0155

Opinion filed May 13, 1992.—Rehearing denied June 11, 1992.

G. Joseph Weller, Robert C. Cooper, and Ingrid L. Moller, all of State Appellate Defender's Office, of Elgin, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers, Martin P. Moltz, and Cynthia N. Schneider, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE NICKELS delivered the opinion of the court:

Following a jury trial in the circuit court of Lake County, defendant, Juan Luis Turcios, was found guilty of two counts of second degree murder of Raul Turcios although he was originally charged with first degree murder, attempted first degree murder of Roberto Mendez, and three counts of armed violence. Defendant's codefendant and brother, Angel Turcios, was acquitted on all eight original counts in the indictment against both defendants. Defendant received a term of six years' imprisonment on one of the second degree murder convictions (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(2)); eight years' imprisonment for attempted first degree murder (Ill. Rev. Stat. 1989, ch. 38, pars. 8—4(a), 9—1(a)(1)); and eight years' imprisonment on each of the two convictions of armed violence (Ill. Rev. Stat. 1989, ch. 38, par. 33A—2), all sentences to run concurrently.

On appeal defendant contends he was not proved guilty beyond a reasonable doubt of second degree murder and armed violence with respect to Raul Turcios. He claims he was not proved guilty beyond a reasonable doubt of attempted first degree murder of Roberto Mendez. Defendant also raises four other issues: whether the court improperly limited defendant's cross-examination of a witness; whether the jury should have been instructed as to attempted second degree murder; whether his armed violence convictions must be vacated as predicated on the same acts; and whether he is entitled to a credit on his fine.

The State presented several witnesses regarding the shooting that occurred on July 23, 1989, at the intersection of Water and St. James Streets in Waukegan, Illinois. Salomon Andino testified that Raul Turcios (Raul) was Andino's wife's cousin; defendant was Andino's wife's brother. Raul left the house shortly after 11 a.m. on July 23, 1989.

Andino did not see Raul with any alcoholic beverages that morning, nor did Raul appear to have been drinking.

Roberto Mendez' brother, Carlos Mendez, testified that Raul and Roberto Mendez (Roberto) came to his house about noon that day. They each had one beer and left. Neither appeared intoxicated.

Roberto's sister-in-law, Daisy Mendez, heard 12 to 14 gunshots a little after noon on July 23, 1989. Then she heard three more shots. Outside she observed Raul lying facedown in the street. Roberto was on the ground with gunshot wounds, and Angel Turcios was hitting Roberto with a baseball bat. Defendant was holding a gun in his hand. Defendant and Angel left the scene in an automobile. Daisy Mendez described the entire incident as one-half hour in duration but also said it lasted an hour and a short time.

After his wife heard shots, Nicholas Alvarez looked out his window and saw a dead man lying in front of a truck. Another man was shooting at a third man who was near the back of the truck. He heard three more shots, and all the shots sounded the same. The police had arrived and about 30 people were around. In addition to the dead man, another man was on the grass across the street. He was bleeding, and someone was hitting him with a baseball bat. Alvarez did not see a gold watch or a gun near the men, and he did not see anyone pick up a gun. He thought the shooting lasted about three minutes.

Jose Mendez, Roberto's brother, heard quite a few shots, and they sounded the same. He saw Angel Turcios hitting Roberto with a bat. Then Angel got in a car, and the car left. Jose did not see defendant.

Jose David Acosta, Sr., testified that he and his son were driving to work when he saw a pickup truck and a car stopped in front of the truck parked in the street. Acosta, Sr., heard voices and two shots being fired. He saw defendant, who was on the side of the car, shoot at a man, who was by the truck, and the man fell. Angel Turcios ran toward Roberto, and they fought over a bat. Defendant came toward them, and Roberto let go of the bat and fled. Defendant shot Roberto two times. Defendant continued to shoot at Roberto as Roberto ran towards Colon's grocery store. Defendant held the gun in his right hand in an extended manner, with his left hand holding his right wrist. Roberto kept running towards his house, and defendant continued to shoot at him. Defendant stopped to reload the gun. Defendant shot Roberto and went over to Roberto, who had fallen, and shot at him. Defendant was tranquil during the shooting. Angel hit Roberto several times with the bat. Defendant and Angel left in the car. Acosta, Sr., did not see anyone else with a gun.

During cross-examination, Acosta, Sr., estimated that the incident lasted about seven minutes. He did not see a gun near Raul's body or any other object when he went over to look after the police arrived.

David Acosta, Jr., was in the car with his father, Jose Acosta, Sr., at the time of the incident. He saw four people outside a car and a truck. The man who later died (Raul) was by the passenger side of the truck arguing with another man whom Acosta, Jr., could not identify. Raul did not have a weapon or a gun but the other man had a gun. He heard shots, and Raul fell to the ground. Acosta, Jr., saw another man, whom he could not identify, with a baseball bat. The man chased Roberto toward the grocery store. The man with the gun shot at Roberto while the other man chased Roberto with the bat.

The man with the gun stopped shooting and ran towards the car. The other man kept hitting Roberto with the bat while Roberto was lying on the grass. Acosta, Jr., did not see a gun lying in the street, nor did he see Roberto with a gun or a bat.

During cross-examination, Acosta, Jr., said he did not see the gun until after the third shot and the man fell. However, he later said the man fell after the second shot and then a third shot was fired. He admitted that he initially told the police some incorrect information about what he saw. Acosta, Jr., said he had translated some of the witnesses' statements for the police at the scene and he was very nervous at the time of the incident.

Hector Acosta and Cristobal Flores heard gunshots. Flores observed defendant, holding a gun with two hands, shooting at Roberto. Raul was already lying in the street. Otilia Mendez, Roberto's sister, saw defendant shooting at Roberto after she heard shots fired. The other man was hitting Roberto with a bat.

Regina Haley, a 14-year-old girl, lived one street over from the incident. She observed four Hispanic men standing outside of their vehicles. Defendant was shooting a gun at an unarmed man who was trying to get under the truck. Another man, Angel, was chasing the fourth man with a baseball bat. Haley said that the men had been arguing and defendant got a gun from the car. She was not sure who got the bat.

On cross-examination, Haley said she originally looked over at the men because she heard them arguing and then she saw the shooting. She could not see any of the men really well. After the men left, some people went up to Raul's body. She was uncertain later on whether defendant went back to the car to get a gun.

Roberto Mendez testified for the State that he came to the United States from Honduras in 1986. He was picked up by immigration but

was not deported. He said he posted a bond and left the country because he did not like it. He returned in May 1989.

About 11:15 a.m. on July 23, 1989, Roberto picked up Raul at Salomon Andino's house. They went to Carlos Mendez' house, had a beer, and left. As he got to the intersection, defendant's car pulled directly in front of Roberto's pickup truck and blocked him. Defendant called and motioned for Raul. Raul went over to defendant, and Roberto walked to the passenger side of defendant's car.

Defendant asked Raul if Raul had any weapons, and Raul said "No." Defendant said he had weapons and then shot at Raul once. Defendant was in his car when he shot at Raul. Raul did not have a gun. Roberto tried to go back to his house, but defendant started shooting at him. Angel got out of the car and tried to block Roberto's way with a bat. Roberto was running back and forth and got shot in the right leg. He did not fall down until he got shot in the left leg. He was wounded in his left wrist.

After Roberto was on the ground, defendant shot at him about three more times. Roberto moved back and forth to avoid being shot. Angel came over and tried to hit Roberto with the bat several times. Roberto put up his arms in defense, but he was struck about six times. He said neither Raul nor he had a gun that day and neither had their hands on the bat.

During cross-examination Roberto said he knew defendant from Honduras. There were problems with the Turcios family. The Turcios family had broken windows at Roberto's brother's place, broken car windows and had driven by the house many times. Roberto clarified that the windows in his house or car were not broken. He had not noticed whether Raul was intoxicated that day but said Raul was tranquil.

Brenda Rodriquez was a passenger in a car driven by Holly Crooks, traveling on a street parallel to the street where the incident occurred. She heard something like firecrackers and saw a car in the middle of the street with someone hanging out of it. Rodriquez saw a Hispanic man standing on a curb with his arm outstretched. Another man was about 18 inches in front of him. She heard another shot, and the man in front of the man on the curb fell. Holly Crooks testified that she thought she heard firecrackers. Crooks observed a man lying on the ground. Another man had a baseball bat and was chasing a man.

Dr. Carlos Puig treated Roberto at St. Therese Hospital following the shooting. Roberto suffered a gunshot wound to each thigh. There

was a superficial gunshot wound to the left wrist which required closure because tendons were exposed.

Dr. Larry Blum, a forensic pathologist, performed the autopsy on Raul Turcios. Raul died as a result of one gunshot wound to the right upper chest. The path of the bullet showed it entered the right chest and moved left in a slightly downward movement of about 1½ inches. The bullet went through the right lung and embedded itself in the spine. Raul had a blood-alcohol level of 0.218 and 0.214 level in the urine. During cross-examination, Blum said the angle of the bullet could be caused by someone shooting from an elevated position or if Raul were leaning when he was shot.

Three witnesses from Milwaukee, Wisconsin, testified that defendant and Angel were at Mitchell Field in Milwaukee in the afternoon of July 23, 1989. They tried to purchase one-way tickets to Miami, Florida. They were arrested.

Evidence technician Steven Jones of the Waukegan police department investigated the scene. Many people were milling about. Raul was lying by the pickup truck, and Roberto was in the parkway. Jones located three white buttons, seven .38 caliber automatic spent cartridges, and three lead fragments at the scene. A blue Toyota (defendant's car) had what appeared to be bloodstains on the front, driver's side quarter panel. A baseball bat was in the front passenger side. There was a hole in the windshield toward the center right. The windshield liner had been moved to give the appearance that something came from the inside to the outside. A number of small lead fragments were found in the car, and a cartridge casing was located on the front passenger seat. Jones said he did not recover a gold watch.

John Moran, a detective for the Waukegan police department, recovered a shirt with three missing buttons and bloodstains on the front and a .38 caliber semiautomatic handgun from defendant's house. The gun and the clip in the gun were empty. Casings would be ejected to the right when the gun was fired. The gun held about nine bullets.

Stipulations included that trace elements of gunshot residue were found on the dashboard of defendant's car. Tests from the windshield and liner failed to reveal residues that could be attributed solely to gunshot residue. Cartridges were fired from the .38 semiautomatic pistol.

Waukegan police officer Ralph Henriquez went to Milwaukee on July 23, 1989, to interview defendant and Angel in the county jail. Henriquez was fluent in Spanish. Defendant made a statement to him in Spanish. According to defendant, Roberto had been harassing defendant and his family for some time. Earlier on July 23, 1989,

defendant's brother, Santos, told defendant that Roberto and Raul tried to stop Santos' car and that Roberto had a gun.

Defendant, taking his gun for safety, and Angel left in defendant's Toyota. Roberto and Raul stopped defendant as he approached Water and St. James Streets. Raul came over to defendant and grabbed at defendant's shirt while defendant sat in the car. While Raul was pulling at defendant's shirt, defendant shot at Raul. Defendant then observed Roberto pointing a gun at him. Defendant shot at Roberto, hitting him in the arm. Roberto dropped the gun, picked up a bat that Raul dropped and came toward defendant. Defendant shot Roberto again. Defendant and Angel then fled. Defendant put the bat in the car but gave his gun and his shirt to his sister. After being told that his story conflicted with other witnesses', defendant said that Roberto had many friends in the area and one of them may have taken the gun from the scene.

During cross-examination, Henriquez said he took handwritten notes of the interview and transcribed them later in a typed report. Officer Pratt was present during the interview but he did not understand Spanish. He never presented the typed statement to defendant for review and signature.

Waukegan police officer Luis Marquez interviewed Angel Turcios in Milwaukee who made a statement in Spanish. Marquez spoke Spanish but could not write it; therefore, he wrote his notes in English. Detective Meadie was present during the interview. Later Marquez dictated the statement to Meadie, who typed it in English. Marquez translated the typed statement to Angel because Angel did not understand English. Angel signed the statement.

According to Angel's statement, Santos reported that Roberto and Raul pulled up next to his car and Raul displayed a gun. Shortly afterwards Roberto and Raul drove past the station, yelled obscenities and made an obscene hand gesture. Defendant got his gun, and he and Angel left in defendant's car. Defendant stopped his car to block the victim's truck. Raul went over to defendant to speak to him. Defendant pulled out the gun from under the seat, left the car, and fired three shots at Raul, who fell. Roberto approached Angel with a bat and hit him several times. Defendant came over and fired several shots at Roberto. Roberto fell, and defendant came over and fired several shots at him at close range. Angel struck Roberto several times with the bat. Defendant and Angel left the scene. Angel said he did not see Roberto or Raul with a gun.

Detective Donald Meadie said the majority of Angel's interview was in Spanish because Angel spoke little English. Meadie did not

speak Spanish. He had no way of knowing whether what Marquez said to Angel in Spanish was truly from the statement.

The State rested, and defendant began his defense with forensic pathologist Dr. Robert Kirschner. For a man of Raul's height and weight, Kirschner opined that it would take about 14 alcoholic drinks within a two-hour period to reach the level of blood alcohol of 0.218. Because the urine level was 0.214, Kirschner said the consumption of alcohol was fairly recent. Raul had received blood transfusions and fluids in an effort to revive him which meant his blood-alcohol level was even higher than 0.218 prior to receiving these fluids. Kirschner said that this level would significantly impair a person's balance, coordination, motor movements, emotional control, reaction time, and judgment.

During cross-examination Kirschner explained that the urine-alcohol level could have been lower than the blood-alcohol level because Raul's heart was not functioning properly after being shot. He said that about 98% of the population would be comatose with that level of alcohol but that some alcoholics have higher tolerance.

Elida Fuentes knew Raul since 1988. In October 1988 she heard Raul arguing with defendant over the telephone. Raul said later that he would kill defendant and defendant's family if defendant did not leave him alone. Elida also related an incident in June 1989 in Sheboygan, Wisconsin. Raul was drunk, and during a disagreement with Elida, he struck her and her daughter.

Quadalupe Villareal was present during this June 1989 incident. Raul had a knife in each hand and threatened to kill everyone present. Raul put the knives in his pockets after Villareal talked to him.

Defendant called Maria Alvarado, a typist for the Great Lakes police department. About noon on July 23, 1989, she was leaving Colon's grocery store near the incident. She saw a blue truck moving fast, and it barely stopped at a stop sign. The truck rounded the corner and stopped at St. James where a small blue car blocked its way. The men in the truck walked towards the car, arguing with the man therein.

The truck passenger had a baseball bat as he went toward the car. The driver of the truck, who she said was Raul, stood by the door of the car and fired a gun at the driver's window. Alvarado ran to get help. She came back, heard more shots coming from the car, the men in the street fell, and the car drove away. Defendant was driving the car. After the shooting she saw someone come out of Roberto's house, pick up the gun that was near Raul and run away. Alvarado had gone out with Raul once, and he carried a gun at that time.

During cross-examination Alvarado said neither Raul nor the other man had anything with them when they left the truck. The men walked back to the truck, and she saw the passenger with a bat. Now, she said Raul was by the truck when he fired into the car's driver's side window. Raul fell as soon as he got shot, and the gun fell by his side. The other man was shot a couple of times. She never saw the men that were in the car get out of the car. She never saw them fight over the bat.

Defendant's brother, Santos Turcios, testified that about 11:30 a.m. on July 23, 1989, he was driving in his car when Raul and Roberto began to follow him. They yelled obscenities and threatened him, and Roberto flashed a gun. Santos saw a police officer and tried to explain the situation and pointed out the truck. Then Santos told defendant and Angel about the incident. Defendant and Angel, who were already going out, left. About a week prior, Raul told Santos to tell defendant that Raul was "going to break his face up with bullets."

Victorina Andino, defendant's sister, said Raul came to live with her and Salomon in July 1989. The night before the incident Raul was very drunk. When Raul left the house on July 23, 1989, to go out with Roberto, Raul had a gun inside the top of his pants.

Waukegan police officer Patrick Carry was the officer flagged down by Santos Turcios about noon on July 23, 1989. Santos reported that Raul and Roberto were in a blue car, not a truck, and were following him. Carry had no trouble communicating with Santos.

Waukegan police lieutenant Terry House said when he arrived at the scene paramedics were tending to Raul. Raul was lying next to the pickup truck in the street. Another individual was in the parkway. About 30 people were in the area. He saw a gold-colored wristwatch near the rear of the truck. The watch was gone about 15 minutes later. He said the pickup truck was stopped on the curb.

Defendant testified that he knew Raul in Honduras. Raul was a lieutenant in the Honduran military, but Raul said he was discharged for shooting a major. Defendant also heard that Roberto killed a man in 1981 with a rifle. Raul had called defendant from Sheboygan in mid-July 1989 and asked to stay with defendant. When defendant turned him down, Raul became angry and threatened to kill defendant. Later, Raul asked defendant for a $4,000 loan on two occasions. Raul threatened to harm and kill defendant after defendant refused the loan.

Defendant was in his car waiting to go to lunch on July 23, 1989, when Santos told defendant about Raul and Roberto harassing him. Defendant and Angel then left to go get lunch at Colon's when they saw Raul and Roberto. Raul came toward defendant and asked him if

Santos had told defendant what Raul had said. Raul was very drunk. Defendant offered Raul $1,000 for the loan but Raul needed $4,000. Raul swore at defendant and threatened to kill him. Raul told defendant to wait, and he walked toward the truck. Raul returned quickly, grabbed defendant through the window and fired a shot at defendant. Defendant leaned to the right, and the bullet missed him. Defendant took his gun from under the seat and shot at Raul without looking. Defendant explained that he kept a handgun in his car for protection because he often had cash on him from his business. He identified the gun from the shooting as his.

Defendant had taken the gun from the glove compartment when Raul returned to the truck. After defendant fired his first shot, he got out of the car. Raul had the gun down by his leg, pointing toward the ground. Defendant told him to throw the gun away. When Raul did not release the gun, defendant shot at him again.

Roberto and Angel were fighting over the bat. Roberto struck Angel while he was on the ground, and Angel grabbed the bat from him. They were fighting over the bat, and defendant fired a shot in the air. Roberto let the bat go. Roberto went over to where Raul was lying and bent down to take the gun. Defendant shot down at Roberto. Defendant told Angel, "Let's go." Defendant was shooting everywhere because he was scared. He did not know if Roberto had another gun. Defendant and Angel left. Defendant noticed the hole in his windshield but said he never fired in that direction. Angel took the bat, and Raul's gun was near Raul. Defendant brought the gun to his sister's house, borrowed a shirt, and left for Milwaukee because he was frightened. He verified that he tried to fly to Miami. Defendant also said that Roberto Mendez had a civil lawsuit pending against him for money damages as a result of this incident.

During cross-examination, defendant said that when he went to lunch on July 23, 1989, he took a route which went past Roberto's house. When defendant shot at Raul the second time, defendant said Raul was by the car. Defendant did not think he hit him, and he only fired two shots at Raul. Defendant said he did not see Roberto hit Angel with the bat. On redirect, defendant said Roberto never pointed a gun at him that day, only Raul did. Raul never had the bat.

Angel Turcios corroborated defendant's testimony. When Raul grabbed defendant by the chest, Angel heard a "big sound." He got out of the car and heard more shooting. He said defendant kept the gun in the compartment between the seats. Defendant put the gun under his leg when Raul returned to the truck. He said he did not see a

gun when he heard the shot but that defendant's gun was still where he described.

Roberto came at Angel with a bat and chased him. Angel could hear shots. He and Roberto fought over the bat. Roberto hit Angel with the bat while Angel was on the ground. Roberto let go of the bat and went toward Raul. As Roberto went for Raul's gun, Angel struck him with the bat. Angel heard more shots, and defendant said, "Let's go," and they left. Angel said his statement to Officer Marquez contained material which he never said. Marquez did not read the statement to him before he signed it.

Officer Henriquez was called by defendant and questioned about defendant's statement made in Milwaukee. Defendant's statement wherein defendant said that Raul had the bat and Roberto had the gun was accurately taken down by Henriquez. However, he admitted that in a statement from Santos Turcios Henriquez incorrectly put down that Roberto and Angel chased Santos with a gun. It should have been Roberto and Raul.

The jury returned verdicts of guilty on two counts of second degree murder of Raul Turcios against defendant, but the judge subsequently entered judgment on only count II. Defendant was found guilty of attempted first degree murder of Roberto (count III) and three counts of armed violence. Convictions were imposed on only counts IV and VIII for armed violence. Angel was acquitted on all counts.

In the first issue, defendant contends that he was not proved guilty beyond a reasonable doubt of second degree murder and armed violence against Raul Turcios. He argues that in view of the verdict the jury found that defendant believed deadly force was necessary to prevent death or great bodily harm. However, the jury concluded defendant's belief was unreasonable. He claims the evidence shows his belief was reasonable and asks that his conviction be reversed.

Whether a killing is justified under the law of self-defense is a question of fact to be determined by the trier of fact. (*People v. Felella* (1989), 131 Ill. 2d 525.) Self-defense requires that the use of force be reasonably believed necessary in order to be justified. (See *People v. Swanson* (1991), 211 Ill. App. 3d 510.) Once the defense is raised, a question of fact arises as to whether the belief was reasonable, and the State bears the burden of proving that the defendant's use of force was not justified. (*Swanson*, 211 Ill. App. 3d at 513.) The reasonableness of the defendant's belief is a matter for the jury to decide. (*People v. Lynch* (1987), 151 Ill. App. 3d 987.) Unless the record raises serious questions regarding the appropriateness of the jury's decision, it

should not be disturbed by a reviewing court. (*People v. Daniel* (1989), 191 Ill. App. 3d 837.) The determination will not be disturbed on appeal unless the evidence is so unreasonable, improbable or unsatisfactory as to leave a reasonable doubt of defendant's guilt. See *Felella*, 131 Ill. 2d at 533-34.

The State does not respond to defendant's first issue on the merits. It contends that defendant's argument is impermissible because whether defendant's subjective belief was reasonable was a jury issue. (*People v. Lockett* (1980), 82 Ill. 2d 546.) Relying on *Lockett*, the State argues that the reasonableness issue cannot be determined as a matter of law.

It is apparent that the State misconstrues *Lockett*. The defendant in *Lockett* had requested, but was refused, an instruction on voluntary manslaughter based upon an unreasonable belief of justification, *i.e.*, self-defense. The jury was instructed on self-defense. The *Lockett* court found that a self-defense and a voluntary manslaughter instruction should be given when any evidence is presented showing the subjective belief that use of force was necessary. *Lockett*, 82 Ill. 2d at 552.

The State relies on the following language from *Lockett*:

> "We can conceive of no circumstance when a judge could determine, as a matter of law, that a jury could find the defendant had a reasonable subjective belief the killing was justified, but that the jury could not find the defendant's subjective belief was unreasonable." (*Lockett*, 82 Ill. 2d at 553.)

When read in the context of the entire opinion, it is clear what the supreme court meant. The court was merely noting the impossibility of the trial court determining the need for a self-defense instruction based on the evidence and yet not also determining the need for a voluntary manslaughter instruction based on the same evidence since the belief in self-defense may have been unreasonable. We do not read *Lockett* to stand for the position that a jury's finding on the reasonableness of a person's subjective belief in the use of force may never be reviewed by an appellate court when challenged on appeal. See, *e.g.*, *Felella*, 131 Ill. 2d 525; *Swanson*, 211 Ill. App. 3d 510; *Lynch*, 151 Ill. App. 3d 987; *People v. Clevenger* (1985), 130 Ill. App. 3d 1087.

The State further argues that defendant's argument is inconsistent with his position under the fourth issue on appeal. Therein defendant argues about the necessity of a jury instruction on attempted second degree murder with respect to the shooting of Roberto and cites *Lockett* within his argument. We do not find defendant's arguments irreconcilable. Two different victims and offenses as well as different facts relating thereto are involved in this case. Defendant's argument

that the evidence is insufficient to prove an unreasonable belief in the use of force with respect to Raul's death is separate and distinct from his claim that an instruction for attempted second degree murder based on an unreasonable belief in the use of force was required in the attempted murder of Roberto.

Turning to the substance of defendant's first issue, he points to the threats made by Raul towards defendant and defendant's family. Defendant was aware of Raul's violent behavior, especially when drunk. Defendant said Raul was intoxicated, and the pathologist testified that Raul had a 0.218 blood-alcohol level. Raul grabbed defendant while defendant was seated in his car. Defendant said Raul shot at defendant and points to the hole in the windshield as corroborative evidence. Defendant said he shot at Raul when Raul was leaning in the car window. The downward path of the bullet indicates that Raul may have been shot while leaning. A witness saw Raul shoot at defendant and saw someone take the gun from near Raul's body and leave. Defendant argues that this was corroborated by the fact that a watch disappeared from the scene.

There was conflicting testimony as to the shooting. It was the function of the jury to observe the demeanor of the witnesses and judge their credibility. (*People v. Almo* (1985), 108 Ill. 2d 54.) Where the evidence is merely conflicting, a reviewing court will not substitute its judgment for that of the trier of fact. (*People v. Graca* (1991), 220 Ill. App. 3d 214.) Our review of the record reveals there was sufficient evidence for the jury to conclude that it was not reasonable for defendant to believe it necessary to kill Raul in order to prevent the threat of great bodily harm or death.

While Victorina Andino testified that Raul left the house that morning with a gun, other witnesses said that Raul did not have a gun. Defendant points out that no State witnesses saw the entire exchange between defendant and Raul. We note that while Roberto Mendez, the other victim, did see the entire incident, the jury apparently did not find him totally credible as they acquitted Angel Turcios of all counts. Maria Alvarado testified that Raul first fired through defendant's open car window. However, she also said that defendant and his brother never left their car and did not fight over the baseball bat. This part of her testimony was contradicted by other witnesses, including defendant.

Witnesses heard several shots of the same quality in succession. Defendant argues that he shot at Raul while Raul was leaning in the window and the direction of the bullet within Raul's body verifies that claim. Of course, the direction of the bullet could have resulted from

defendant shooting at Raul from an elevated position. Although she was driving about a block away, Brenda Rodriquez said the shooter was standing on a curb. There was evidence that the truck was stopped on a curb, and defendant shot Raul near the truck. Other witnesses observed defendant and Raul standing and arguing before defendant shot Raul. Even defendant said Raul did not drop the gun and remained standing after defendant first shot at Raul. Defendant said he did not aim when he first shot at Raul. Raul's body was found by the truck. Raul had a high level of alcohol in him, but if Raul was struck by defendant's first shot at the car window, as defendant suggests, the other testimony would mean that Raul remained standing and somehow moved to the side of the truck while a .38 caliber bullet was lodged in his spine after it passed through his lung. The jury could have found it incredible to believe that defendant actually shot Raul while Raul was at the window.

No gun was found near Raul or anywhere at the scene. Alvarado saw someone take the gun, but other witnesses said there was no gun. Defendant points to the missing watch. Lieutenant House saw a watch near the back of the truck when he arrived which disappeared from the scene. Raul's body was near the front of the truck. There were several people in the area, but no other witnesses saw anyone take anything from near the body.

Defendant points to the hole in the windshield as corroborating his version of the events. The jury was not required to accept defendant's version of the incident. (See *People v. Wilks* (1988), 175 Ill. App. 3d 68.) Moreover, a rejection of defendant's version is supported by the evidence. The State impeached defendant at trial with his previous inconsistent statement that he shot first at Raul. The jury could consider defendant's conflicting version in determining the probability of defendant's claim. (See *People v. Scott* (1989), 180 Ill. App. 3d 418.) The jury also heard defendant testify that he shot at Raul without aiming and from inside the car. The jury may have believed that defendant was responsible for the hole in the windshield. Defendant's flight from the scene could reasonably be interpreted as negating a claim of self-defense. See *People v. Clevenger* (1985), 130 Ill. App. 3d 1087.

Defendant relies on *People v. Brown* (1966), 78 Ill. App. 2d 327, and *People v. Shipp* (1977), 52 Ill. App. 3d 470, as factually parallel. However, in *Brown* there was only the defendant's version of what occurred. The defendant thought the victim had something in his hand and also told police that he thought the victim had a knife. A knife was found near the deceased victim. In *Shipp* the defendant killed her exhusband after he continued to harass her after their divorce. Their

past relationship was stormy and violent. Additionally, the victim therein had served time for attempted murder after he tried to kill the defendant on a prior occasion. (*People v. Williams* (1989), 205 Ill. App. 3d 751, 763.) The evidence herein was conflicting as to whether Raul had a gun. The evidence shows that defendant had a subjective belief that deadly force was necessary. However, there was sufficient evidence to support the jury's finding that the belief was unreasonable beyond a reasonable doubt.

In the next issue, defendant claims that he was not proved guilty beyond a reasonable doubt of attempted first degree murder of Roberto Mendez. He argues that the evidence is insufficient to prove he had a specific intent to kill Roberto. He points to testimony that he fired several shots at Roberto, about three at very close range, and yet failed to seriously injure Roberto to show he did not intend to kill Roberto.

Attempted murder requires the mental state of specific intent to commit murder, to kill someone. (*People v. Jones* (1979), 81 Ill. 2d 1, 8.) The evidence must prove beyond a reasonable doubt that the defendant had and acted with the specific intent to kill the victim and that he took a substantial step towards the commission of the attempted murder. (*People v. Shum* (1987), 117 Ill. 2d 317.) Intent may be inferred from the character of the assault and the use of a deadly weapon. (*People v. Gomez* (1986), 141 Ill. App. 3d 935.) It is the function of the jury to determine the existence of the defendant's requisite intent, and that determination is not to be disturbed on review unless a reasonable doubt of the defendant's guilt clearly appears. (*People v. Okundaye* (1989), 189 Ill. App. 3d 601.) The evidence must be viewed in a light most favorable to the prosecution, and the court must determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Young* (1989), 128 Ill. 2d 1.

■ There was testimony that defendant fired a gun several times at Roberto as Roberto ran in different directions. There was testimony that defendant held the gun with both hands, similar to a firing-range stance. (See *People v. Bond* (1989), 178 Ill. App. 3d 959.) He continued to shoot at Roberto after Roberto was hit and lying on the ground. Although defendant claims Roberto was not seriously injured, we disagree. Roberto suffered a bullet wound in each leg and a wrist injury from a bullet. While defendant points out that defendant missed Roberto from a distance of about three feet, Roberto testified that he was moving back and forth to avoid being shot. Additionally, Roberto was running and changing directions when he was shot by defendant.

The evidence was sufficient to support defendant's attempted murder conviction.

Defendant contends in the third issue that the trial court committed reversible error by restricting cross-examination of Roberto Mendez. He argues that he presented unrefuted evidence that Roberto was an illegal alien; that Roberto was in the United States since January 1989, not May 1989; that he worked under an alias; that he had a social security number under an alias; and that he executed W-4 forms swearing he was Samuel Rodriquez. Defendant posits that Roberto had a motive to testify falsely due to a real or imagined expectation of leniency and these facts also went to his interest and bias.

We must clarify certain misstatements of the facts on both the State's and defendant's part based on our review of the record. Judy Zires stated during an offer of proof on cross-examination that she did not see Samuel Rodriquez/Roberto complete the forms. She only saw him sign them. The trial court did not rule that defendant failed to prove that Roberto worked at Ameripac under another name. It ruled that such evidence was collateral. Defendant did not present any evidence or make an offer of proof that Roberto was in the United States illegally. Roberto said he was here on a passport. Defendant did not impeach Roberto with any evidence of his illegal immigration status, if true, although the trial court indicated that such would be proper to show Roberto's interest. The fact Roberto may have used an alias and a false social security number alone did not prove that he was an illegal alien. There can be other reasons for such actions. Nor did Roberto admit that his presence in the United States and employment at the time of trial were illegal as the State claims he did.

The trial judge ruled that defendant could ask Roberto about his immigration status and use of a false social security number. He indicated that proving Roberto was an illegal alien would show bias or interest. However, the judge would not allow cross-examination or impeachment on Roberto's employment with Ameripac or with respect to certain forms filled out by Roberto as "Samuel Rodriquez."

The latitude allowed on cross-examination and rebuttal is a matter within the trial court's sound discretion. (*People v. Wadley* (1988), 169 Ill. App. 3d 1036.) A reviewing court should not interfere unless there has been a clear abuse of discretion resulting in manifest prejudice to defendant. (*People v. Collins* (1985), 106 Ill. 2d 237.) As a matter affecting credibility, a defendant has a right to inquire about any interest, bias, or motive to testify falsely on the part of a witness. (*People v. Baugh* (1981), 96 Ill. App. 3d 946.) Impeachment of a witness for the purpose of showing bias in testifying is an important function of the

constitutionally protected right of cross-examination. *People v. Betts* (1983), 116 Ill. App. 3d 551.

Generally, defendant need not show beforehand that any promises of leniency have been made or any expectations of special favor exist in the mind of the witness. (*People v. Freeman* (1981), 100 Ill. App. 3d 478.) The key factor is not the existence of actual pressure, but the witness' state of mind. (*People v. Austin* (1984), 123 Ill. App. 3d 788.) An illegal alien might be vulnerable to pressure, real or imagined, from the authorities. (*Austin*, 123 Ill. App. 3d at 797.) Thus, a defendant can present the residency status of the State's witness and argue bias if the witness was in fact an illegal alien. *Austin*, 123 Ill. App. 3d at 797.

●3 As noted, defendant's cross-examination of Roberto concerning his immigration status was not restricted. Defendant never asked Roberto what his immigration status was. Defendant's offer of proof does not establish that Roberto was an illegal alien. Thus, there is no error with respect to cross-examination or impeachment on this point.

Defendant was allowed to cross-examine Roberto about use of a social security number, use of another name, signing Federal W-4 forms, and working at Ameripac. Defendant was restricted with cross-examining Roberto about an employment application with Ameripac and was not allowed to impeach Roberto with respect to employment with Ameripac and the social security number. The court found these collateral matters. The subject matter of impeachment may not be collateral. (*People v. Persinger* (1977), 49 Ill. App. 3d 116.) Whether Roberto did work at Ameripac and the length of time he was in the United States were collateral matters. The fact he signed W-4 forms under another name under penalty of perjury was also properly excluded. Only conviction of a crime, *i.e.*, perjury, may be shown; evidence of the actual commission of the offense is inadmissible. (See *People v. Cameron* (1989), 189 Ill. App. 3d 998.) Since defendant's offer of proof did not establish that Roberto was an illegal alien, the relevance of his use of a false social security number, other than evidence of a crime without a conviction, is not apparent.

In any event, assuming *arguendo* that the trial court erred in restricting cross-examination and impeachment of Roberto, the error was harmless. (See *Baugh*, 96 Ill. App. 3d 946.) Roberto had admitted that he was caught by immigration authorities in 1986 after entering California. He stated that he worked without a social security number and knew that was illegal. We also note that during defense counsel's direct examination of defendant the jury became aware of Roberto's civil lawsuit against defendant. While Roberto was not impeached with this fact, his credibility was affected by this interest. (See *People v.*

*Crosser* (1983), 117 Ill. App. 3d 24, 29.) Bias may be shown by the fact that the witness has a lawsuit pending against defendant. (*Crosser*, 117 Ill. App. 3d at 29.) Furthermore, Roberto testified that codefendant Angel Turcios attacked him with the bat, yet the jury acquitted Angel of all counts. This fact indicates that the jury did not find Roberto credible. While Roberto was the only State witness who saw the entire event, there were several witnesses testifying that Raul did not have a gun, and defendant's own prior inconsistent statement indicated he first shot at Raul. The entire record shows the jury was made aware of adequate factors concerning relevant areas of impeachment. *Baugh,* 96 Ill. App. 3d at 951.

Next, defendant claims that the trial court should have instructed the jury with respect to attempted second degree murder of Roberto Mendez. He argues that the theory of self-defense applied with respect to Roberto as it did with Raul. In the alternative, defendant claims he was denied the effective assistance of counsel for the failure to tender an instruction on this lesser offense. Defendant asks that his conviction of attempted first degree murder be reversed and the matter be remanded for a new trial. The State responds by arguing that the failure to tender the instruction was trial strategy. It also claims the trial court properly chose not to encroach on that strategy by instructing *sua sponte*.

Since defendant prepared his initial brief in which he argued for recognition of the offense of attempted second degree murder, this court, as pointed out in defendant's reply brief, with the authoring judge herein specially concurring, decided *People v. Austin* (1991), 215 Ill. App. 3d 323. In *Austin,* this court concluded that the offense of attempted second degree murder based upon an unreasonable belief in the need for self-defense does exist. *Austin,* 215 Ill. App. 3d at 333; *cf. People v. Moore* (1990), 204 Ill. App. 3d 694 (attempted second degree murder based on sudden and intense passion does exist).

While *Austin* provides that the crime of attempted second degree murder exists, defendant was not prejudiced by counsel's failure to seek an instruction on this offense. (*Austin,* 215 Ill. App. 3d at 333.) To prevail on a claim of ineffective assistance of counsel, defendant must establish that counsel's conduct was professionally deficient and, but for the deficiency, there is a reasonable probability that the result of the proceeding would have been different. *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; *People v. Albanese* (1984), 104 Ill. 2d 504.

●4 For the jury to have convicted defendant of attempted second degree murder, it would have been required to find, under defendant's

theory of the case, that defendant's actions were motivated by an actual, but unreasonable, belief that the circumstances required the use of deadly force as a means of self-defense against Roberto. Defendant points to his testimony and that of codefendant Angel that Roberto tried to get Raul's gun after Raul was shot. It is apparent from the verdict against defendant on the second degree murder of Raul that the jury did not believe that Raul had a gun. Defendant contends that prejudice is obvious in light of the verdict of second rather than first degree murder with respect to Raul. However, as indicated previously by this court, as well as defendant, the evidence and factual situations concern different victims.

The testimony of the other witnesses showed that Roberto never came toward or struck defendant with the baseball bat. Defendant continued shooting at an unarmed Roberto after Roberto relinquished the bat to Angel. Roberto tried to escape by running in different directions, but defendant continued to shoot at him. There was testimony that Roberto fell after being struck by the gunfire and crawled to the grass. While he lay there, defendant walked over and shot at him again at close range. We therefore conclude that even had the attempted second degree murder instruction been given, there is not a reasonable probability that defendant would have been convicted of attempted second degree murder rather than attempted first degree murder. Since defendant was not prejudiced by the alleged error, his ineffective assistance of counsel claim must fail. (*Austin*, 215 Ill. App. 3d at 334.) Additionally, any alleged error by the trial court in failing to issue an attempted second degree murder instruction was harmless error. See *People v. Goodman* (1981), 98 Ill. App. 3d 743.

■ In the fifth issue, defendant maintains that his armed violence conviction with respect to Raul Turcios must be vacated because it is based on the same conduct as the second degree murder conviction. (*People v. Drakeford* (1990), 139 Ill. 2d 206.) The State concedes this issue. Pursuant to *Drakeford*, defendant's conviction and accompanying sentence under count VIII of armed violence based upon aggravated battery causing great bodily harm to Raul Turcios is vacated.

■ Defendant also contends that convictions of attempted first degree murder and armed violence with respect to Roberto Mendez cannot stand. He argues that both convictions arise from the shooting of Roberto, which was one physical act. (*People v. King* (1977), 66 Ill. 2d 551.) Defendant points to the indictments for attempted first degree murder and armed violence of Roberto. Both indictments allege that defendant shot Roberto with a gun and struck him with a bat. Defendant correctly points out that there was no evidence that

defendant dealt any blows to Roberto with the bat. The State claims that there was an intervention in the shooting because defendant shot at Roberto when Roberto was standing and when he was on the ground.

When more than one offense arises from a series of incidental or closely related acts and the offenses are not included offenses, conviction and concurrent sentences may be entered on each offense. (*People v. King* (1977), 66 Ill. 2d 551.) Based on our decisions in *People v. Bolden* (1991), 210 Ill. App. 3d 940, and *People v. Williams* (1987), 155 Ill. App. 3d 332, we must vacate one of the convictions since count III, attempted first degree murder, was based on the same underlying conduct charged in count IV, armed violence. Defendant was charged with count III in that he "shot Roberto Mendez with a gun and struck Roberto Mendez with a bat" and in count IV in that he "shot Roberto Mendez with a gun and struck Roberto Mendez with a bat." The State elected to treat the conduct as a single act notwithstanding that there were two separate injuries to Roberto from bullet wounds. (*Bolden*, 210 Ill. App. 3d at 946; see also *People v. Crum* (1989), 183 Ill. App. 3d 473.) As correctly pointed out by defendant, the State has the prerogative of choosing which conviction to vacate. Pursuant to the State's request, the conviction of armed violence under count IV and the accompanying sentence are vacated. The attempted first degree murder conviction stands.

■ Defendant asks for a remand in order to resentence him should his conviction be vacated. Defendant claims the trial court was reluctant to sentence at all. It is clear from the entire context of the court's remarks that it saw the incident as an aberration in defendant's life; however, penitentiary time was necessary in order not to deprecate the seriousness of the offense. We find a remand for resentencing is unnecessary as the record fails to indicate that the trial court was influenced in sentencing defendant on the second degree murder and attempted first degree murder convictions by the separate offenses of armed violence. *Crum*, 183 Ill. App. 3d at 491.

Lastly, defendant requests that he be allowed a credit of $220 toward the $10,000 fine levied against him. Defendant spent 44 days in prison from his arrest until sentencing. Ill. Rev. Stat. 1989, ch. 38, par. 110—14; *People v. Nichols* (1986), 143 Ill. App. 3d 673.

The State does not challenge the authorities cited by defendant, but argues that under the facts of this case defendant should be denied a credit toward his fine. Prior to the trial, bail for defendant was set at $1 million. Defendant posted a bail bond of $100,000. Following conviction and sentencing, defendant moved for and the court allowed

a waiver of the 10% bail-bond costs, $10,000, in order to pay the $10,000 fine imposed against defendant. (Ill. Rev. Stat. 1989, ch. 38, par. 110—7(f).) The State argues that the waiver was made with no consideration of a credit of $220 toward the fine. It contends that the situation contemplated that defendant waived the $220 credit toward his fine by allowing the fine to be satisfied totally from the 10% bail-bond costs. The State cites no authority to support its position.

■ During the post-sentencing proceeding, the record shows the State was present along with defendant's counsel. The State informed the court that it and defendant entered into a stipulated order of forfeiture of defendant's vehicle. Defendant's attorney then stated later, "As part of the arrangement here we have filed a motion." Defense counsel continued explaining the motion as it concerned the request involving the bail-bond costs and the fine. Thus, the record indicates that the bail-bond costs/fine arrangement was agreed to by the State. At no time did defendant or the State raise the question of the $5-a-day credit also being applied to the fine. Since the record fails to establish that the credit was waived by defendant (see generally *People v. Joseph* (1988), 176 Ill. App. 3d 636) and the State did not raise any question with respect to the credit below, defendant is granted a $220 credit toward his fine.

Based upon the foregoing, defendant's convictions and sentences for second degree murder of Raul Turcios and attempted first degree murder of Roberto Mendez are affirmed. The convictions and sentences for armed violence under counts IV and VIII are vacated. Defendant is allowed a $220 credit toward his $10,000 fine.

Affirmed in part as modified; vacated in part.

WOODWARD and GEIGER, JJ., concur.