THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RAYMOND ROGERS, Defendant-Appellant.

First District (6th Division)   No. 1—91—1944

Opinion filed May 20, 1994.

Marshall A. Levin, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Linda Woloshin, and Marci Jacobs, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNAMARA delivered the opinion of the court:

Following a bench trial, defendant Raymond Rogers was found guilty of the first degree murder and aggravated kidnapping of Irving Sanders and the second degree murder of Perry White. Defendant was sentenced to concurrent terms of 40 years and 5 years on the first degree murder count and the second degree murder count, respectively.

On appeal, defendant contends that the State failed to prove the *corpus delicti* with respect to the deceased Sanders; that he was not proved guilty of the crimes because he was acting in self-defense of his person and property; that the trial court improperly permitted the medical examiner to testify as to certain conclusions supporting her theories as to the deaths; and that after the psychiatrist submitted his report that defendant was fit to stand trial with medication, the trial court failed to follow the statutes relevant to adequately protecting defendant's rights. The pertinent facts follow.

On January 5, 1990, defendant, who was employed as a correctional guard for the Cook County sheriff, shot and killed Sanders and White. The shootings occurred at a house in Chicago which defendant owned and where he had lived with his family several months prior to the shootings. At the time of the shootings, the house was uninhabited and boarded up. There was no electricity or heat, and the water pipes were cracked. However, the house was filled with furniture, clothing and other personal belongings.

After the incident, defendant used a neighbor's telephone to call the police. Officers Toni Washington, Joe Parker, Thomas Ptak and Michael Duffin responded to the call. Defendant approached the officers and told them that he had shot the two men and that the two bodies were in the house. Defendant was carrying a blue bag containing wedding pictures and a hammer.

The door was blocked, and the officers gained entry by forcing the door open and removing some boards. They found the house to be in complete disarray. Every inch of the floor space had clothing, furniture or dust on it. The disarray and dirt appeared to have been present for some time.

The officers first discovered White's body. It was wedged between the front door and the bottom step of a short staircase. The officers heard moaning and found Sanders at the top of the stairs. He was handcuffed to a bed frame. Sanders was severely bruised, with brain matter coming from his head and blood all over. He was shaking with pain. Sanders was not responsive to questions and made no intelligent replies. He had wounds to his lower thighs and other injuries about his face. He subsequently died.

The officers found no weapons on White or around where he was lying. Likewise, no weapons were found in Sanders' hands or close to his body.

The police officers had conversations with defendant at the scene. Defendant stated that he had purchased another but smaller house so that he had to leave a lot of belongings behind. He checked his old property every day. Defendant told the officers that on January 4, 1990, he visited the property and saw that the house had been entered and that his prom pictures had been taken. Defendant was worried that his wedding pictures would also be taken, so he returned to the house on January 5 at 7 a.m., upon completion of his midnight shift at Cook County jail. Defendant was carrying his loaded revolver. He pulled out his revolver, entered the house and waited.

Defendant also told the officers that later in the day White and Sanders pulled up in front of the house in a truck. The two men entered the house with their hands in their pockets, but not in a threatening way. As soon as White entered the house, defendant stated that he shot him and "he went down right away." White died as a result of a gunshot wound through the back of the neck. Defendant also shot at Sanders, but apparently kept missing him. He continued to shoot, during which time he reloaded his gun. Defendant, who was 6 feet 4 inches tall and weighed 230 pounds, was then able to knock Sanders down. He hit Sanders on the top of the head and dragged him to the middle of the room, handcuffing him to a bed frame. Defendant then used a meat hook to inflict puncture wounds upon Sanders. Assuming it was Sanders who had taken his belongings, defendant tried to find out where they were. He learned that Sanders had taken defendant's sofa to another address. Sanders unsuccessfully struggled with the handcuffs in an attempt to escape. Defendant then pressed his gun to the back of Sanders' head and shot him. Sanders died as a result of this contact-range gunshot wound to his head. Multiple blunt-trauma injuries contributed to his death.

The police officers recovered defendant's gun, a hammer, and the meat hook. Defendant did not have any cuts, bruises or lacerations. Ptak testified that he had inspected defendant's hands for injuries but found none. Ptak also testified that he asked defendant to remove his shirt and upon doing so, Ptak saw no injuries. Defendant did not complain about pain or injuries, despite the fact that Ptak directly asked defendant whether he was hurt.

Officer Parker testified that defendant did not tell the police that the two men had been shot during a burglary in progress. Parker also did not recall a radio simulcast stating that two men had been shot during a burglary in progress.

Doctor Nancy Jones, the medical examiner who performed the autopsies on both victims, testified on behalf of the State. With regard to White, she stated that he sustained a single gunshot wound to the right side of the back of his neck. Doctor Jones stated that she recovered a rusty knife from White's sleeve and submitted the knife and bullet to the police for inventory. She stated that if White had the knife in his hand prior to being shot, he would not have been physically capable of later concealing the knife in his sleeve after having received the gunshot wound to the back of the head.

With respect to Sanders, Doctor Jones described multiple wounds and injuries to his body, which included a contact-range gunshot wound to the head, and a blunt-trauma injury to his face, to the left side of the forehead and to the back of his head, all unrelated to the gunshot wound and consistent with being struck by a hammer. In addition, Sanders had puncture-type wounds on both legs consistent with being punctured by the meat hook found next to his body. He also had internal injuries on the lungs, ribs and kidney.

Doctor Jones noted that the pattern of the injuries suggested that they were caused to inflict pain, rather than to cause death. In her opinion, the gunshot wound was the final wound suffered by Sanders, stating that it was so significant that death would have occurred within a very short period of time. All of the other wounds showed evidence of having been sustained while the victim was alive.

According to Doctor Jones, it was apparent that Sanders had struggled to free himself from the handcuffs. This was evidenced by the presence of areas of bruising or purple discoloration on his wrist as well as areas where the skin had actually been rubbed away. Doctor Jones noted that prior to her post-mortem examination, Sanders was pronounced dead at a hospital where he had been examined by a number of doctors, whose reports she had prior to making her own examination.

Lastly, Doctor Jones testified that Sanders had 10- to 15-year-old track marks on his arms, evidence of intravenous drug use. A toxicology report revealed that both victims tested positive for a substance which is a residual of cocaine usage.

Defendant testified that he did not arrive at his house until about 4 p.m. on January 5, 1990. He denied having told the police that he went there right after his work shift ended at 7 a.m. He had the blue bag with him but it did not contain a hammer. Upon noticing that the facing on the front door of his house had been ripped off, leaving the door open, he pulled out his fully loaded revolver and went inside to investigate. The facing on the door was intact on the previous day.

When he entered, he noticed that two sofas and a chair were

missing and that his wedding pictures were on the floor. Defendant further stated that he observed two men, who pulled up in front in a pickup truck, approach the house. He heard them state that they would take the bedroom set first. Sanders went into the den, while White went up the stairs to the landing. As White turned to enter the den, defendant shouted, "Halt, I am a peace officer." At that point, Sanders turned around with his left hand in his pocket and a hammer in his right hand, while White had one hand in his pocket. Sanders then told defendant that he "was going to beat [defendant's] black ass." White turned toward Sanders, whereupon defendant's gun went off shooting White. Defendant further testified that White was looking backwards while coming towards defendant and that is why White's gunshot wound was to the back of the head.

Defendant stated that he kept shooting at Sanders because "he kept coming." Sanders had his hammer raised in an effort to intimidate him. Defendant stopped to reload his gun, and Sanders allowed him to do so because he was cautious about getting too close to defendant. Because the gunshots were not effective, he grabbed the hammer from Sanders and used it to hit Sanders "[a] lot of times." At the same time, Sanders was hitting defendant in the back, hurting him. Defendant then handcuffed Sanders and left to call the police. Defendant denied having used the meat hook on Sanders.

Defendant denied that Ptak ever asked him if he had sustained injuries or that Ptak asked him to remove his shirt. Defendant stated that he told Ptak that he shot the victims in self-defense and that he was hit with the board. Defendant did not know how the title to White's truck, which the police retrieved from him, came into his possession.

Defendant testified that he did not know which bullet struck Sanders causing the injury to his head. He did not see the head injury when it was inflicted or when he handcuffed Sanders to the bed frame. Sanders continued to threaten and to tell him where his property was located after defendant had fired his last shot. Defendant did not know whether he had been close enough to Sanders to have shot him in the back of the head, but stated that all of the shots he fired were face to face. He did not know how the cylindrical wounds on Sanders' legs occurred. Defendant also testified that the day before the incident, nothing in the house was out of order or missing.

Defendant first contends that the State failed to prove the *corpus delicti* with respect to Sanders. The primary basis for this argument is that the State failed to provide a life and death witness as to Sanders.

The term *corpus delicti*, which literally means "body of the

offense," contemplates the fact that the crime charged has been committed by someone. (*People v. Frazier* (1984), 129 Ill. App. 3d 704, 472 N.E.2d 1183.) To prove the *corpus delicti* in a criminal homicide, the State must prove that (1) a death occurred and that (2) it was caused by the criminal agency of another. (*People v. Frazier*, 129 Ill. App. 3d 704, 472 N.E.2d 1183.) "If the evidence is all or largely circumstantial, it should be sufficiently compelling to produce a moral and reasonable certainty that the crime was committed and that the defendant committed it." *People v. Frazier*, 129 Ill. App. 3d 704, 711-12, 472 N.E.2d 1183, 1189.

■ The death of Irving Sanders was clearly established at trial. We note initially that his death was not even an issue. Defendant himself testified that he acted in defense of his person and property. The fact that Sanders was dead was inherent to these defenses and is inconsistent with his argument that the *corpus delicti* was not proved. Further, the police officers testified that they found Sanders moaning and handcuffed to a bed frame and that they had him removed to a hospital. Moreover, Sanders' death was confirmed by Doctor Jones, the medical examiner who performed the post-mortem examination of Sanders. In view of all the evidence presented, it was not necessary that the State present a life and death witness regarding Sanders. His *corpus delicti* was established.

Defendant next contends that he was not proved guilty beyond a reasonable doubt. He argues that faced with an obvious invasion of his residence, he had the right to take all actions necessary to defend his person and property.

Section 7—2 of the Criminal Code of 1961 (Code) provides, in pertinent part:

> "A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to prevent or terminate such other's unlawful entry or attack upon a dwelling. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if:
> (a) The entry is made or attempted in a violent, riotous, or tumultuous manner, and he reasonably believes that such force is necessary to prevent an assault upon, or offer of personal violence to, him or another then in the dwelling." Ill. Rev. Stat. 1989, ch. 38, par. 7—2(a).

Because self-defense may justify a defendant's use of force, it is an affirmative defense to the charge of murder and, when raised by the defendant, the State has the burden of proving that the defendant is guilty beyond a reasonable doubt. (*People v. Colson* (1989), 187

Ill. App. 3d 423, 543 N.E.2d 282.) Whether a killing is justified under the law of self-defense is a question of fact to be decided by the trier of fact. (*People v. Turcios* (1992), 228 Ill. App. 3d 583, 593 N.E.2d 907.) "In reaching its determination, the court must decide whether the facts and circumstances would induce a reasonable apprehension of serious bodily harm in light of defendant's perception of the situation when he used force against his aggressor." (*People v. Colson*, 187 Ill. App. 3d at 432, 543 N.E.2d at 287.) Unless the record raises serious questions regarding the appropriateness of the trier of fact's finding as to self-defense, it should not be disturbed by a reviewing court. (*People v. Turcios*, 228 Ill. App. 3d 583, 593 N.E.2d 907.) On appeal, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Sanders* (1991), 212 Ill. App. 3d 773, 571 N.E.2d 836.

In the present case, the trial judge determined with regard to victim White that defendant believed that deadly force was necessary to protect himself, but that that belief was unreasonable. He therefore found him guilty of second degree murder. In regard to Sanders, the trial judge did not find that defendant believed he needed to use deadly force and consequently found him guilty of first degree murder. There was ample evidence presented to support those determinations.

It is undisputed that neither victim entered the residence in a violent, riotous or tumultuous manner. Although Doctor Jones testified that she recovered a rusty knife from White's sleeve, she stated that if White had the knife in his hand prior to being shot, he would not have been physically capable of later concealing the knife in his sleeve after sustaining the gunshot wound to the back of his head. Furthermore, there was considerable dispute as to whether Sanders displayed a hammer. Defendant told the arresting officers that as soon as White entered the house, defendant shot him and "he went down right away." Defendant also told the officers that when he discovered his home had been burglarized the previous day, he went there after work and waited for the alleged burglars. Obviously, defendant did not believe that he was in a life or death situation.

Both victims were shot in the back of the head, thus contradicting defendant's assertion that they were approaching him in a threatening manner. Indeed, defendant offered the incredible testimony that White was backing up as he approached defendant.

Doctor Jones testified that Sanders received more than 20 injuries at the hands of defendant before he was shot in the back of the head.

She believed that defendant most likely inflicted these wounds after he handcuffed Sanders to the bed and before he fired the fatal shot. Defendant's claim of self-defense is without merit.

Defendant next contends that the trial court erred in permitting Doctor Jones, the medical examiner, to testify as to certain conclusions supporting her theories about Sanders' death.

We first consider defendant's claim that Doctor Jones' conclusion that gun powder was present on Sanders' wound could not be proof of that fact since a well-established gunshot residue test was not conducted. Defendant asserts that to allow such unsupported testimony as proof of the presence of gun residue would fail to satisfy the appropriate burden of proof.

■ We find, however, that defendant failed to preserve this issue for review due to his failure to object to the testimony at trial and to raise the alleged error in his post-trial motion. Consequently, he has waived the issue for purposes of this appeal. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) Furthermore, we do not believe that the argument should be considered under the plain error rule.

Defendant also argues that Doctor Jones' conclusions based on the substances and wounds found on Sanders should not have been admitted as evidence to support her theories. He states that there was no evidentiary reason for the trial court to conclude that the fatal gunshot wound occurred after defendant handcuffed Sanders. Defendant points out that he testified that he did not wound Sanders further after handcuffing him. He asserts that the doctor's testimony that the gunshot wound to Sanders' head would have resulted in death within a short period of time is contradicted by the fact that the police found Sanders alive and moaning when they arrived at the scene. We do not agree.

■ Doctor Jones indicated that it would have been highly unlikely that Sanders would have been capable of any type of conscious, deliberate movement, such as walking, running, raising his fists, wielding a weapon or speaking, after receiving the gunshot wound to the head. There was no testimony that moaning was a conscious, deliberate act. Indeed, the police testified that when they found Sanders they tried to talk to him but found him unresponsive to their questions. He was transported to a hospital where he was pronounced dead. Doctor Jones' opinion that Sanders would only have survived for a short period of time after being shot is not incompatible with the evidence.

Defendant finally contends that after receiving a report from a psychiatrist that defendant was fit to stand trial with medication, the trial court failed to follow the statutes relevant to adequately protecting defendant's rights.

On January 14, 1991, the matter was set for trial. On that date, defense counsel informed the trial judge that a few days earlier defendant had voluntarily committed himself to a hospital for psychiatric treatment. The State requested a fitness examination (BCX) to determine defendant's fitness to stand trial, and defense counsel joined in that request. The trial court entered such an order. In March 1991, the trial court received the BCX report from Doctor Gerson H. Kaplan, a psychiatrist. The report stated that defendant was fit to stand trial with medication. The trial began on May 13, 1991.

Defendant contends that after it received the report, the trial court failed to follow the statutes relevant to adequately protecting his rights. Specifically, defendant asserts that the court did not inquire as to his mental or physical condition throughout the proceedings. Even at trial, defendant argues, when he himself began to testify, the trial court failed to make an inquiry. He also asserts that the court never asked him if he was taking his medication. Defendant further maintains that the report prepared by Doctor Kaplan does not meet the requirements pursuant to section 104—15 of the Code. (Ill. Rev. Stat. 1989, ch. 38, par. 104—15.) Defendant points out that although the report indicated that he required medication in order to be fit for trial, it did not state what may have been wrong with defendant such that he needed to be medicated. Furthermore, he contends that the report did not specify what medications defendant required and for what purpose they were to be given.

Finally, defendant argues that the trial court did not conduct a hearing, as required, pursuant to either section 104—16 or 104—21. (Ill. Rev. Stat. 1989, ch. 38, pars. 104—16, 104—21.) Defendant therefore asserts that he was deprived of all rights afforded him pursuant to the statutes concerning fitness to stand trial.

"[A] court is required to order an adversarial hearing to determine a defendant's fitness to stand trial only if it is apprised of facts which raise a *bona fide* question of defendant's fitness." (*People v. Ivory* (1985), 139 Ill. App. 3d 448, 451, 487 N.E.2d 1035, 1037.) The determination as to whether a *bona fide* question of defendant's fitness to stand trial rests generally within the sound discretion of the trial court. (*People v. Ivory*, 139 Ill. App. 3d 448, 487 N.E.2d 1035.) The trial court's decision will not be overturned on review absent an abuse of discretion. (*People v. Ivory*, 139 Ill. App. 3d 448, 487 N.E.2d 1035.) "[T]he mere authorization of a psychiatric examination is not enough to establish that the trial court entertained a *bona fide* doubt of defendant's fitness." *People v. Wilson* (1984), 124 Ill. App. 3d 831, 837, 464 N.E.2d 1158, 1163.

Section 104—15 provides in pertinent part:

"(a) The person or persons conducting an examination of the defendant, pursuant to paragraph (a) or (b) of Section 104—13 shall submit a written report to the court, the State, and the defense within 30 days of the date of the order. The report shall include:

(1) a diagnosis and an explanation as to how it was reached and the facts upon which it was based;

(2) A description of the defendant's mental or physical disability, if any; its severity; and an opinion as to whether and to what extent it impairs the defendant's ability to understand the nature and purpose of the proceedings against him or to assist in his defense, or both." Ill. Rev. Stat. 1989, ch. 38, pars. 104—15 (a)(1), (a)(2).

Section 104—16 states in relevant part:

"The court shall conduct a hearing to determine the issue of the defendant's fitness within 45 days of receipt of the final written report of the person or persons conducting the examination or upon conclusion of the matter then pending before it, subject to continuances allowed pursuant to Section 114—4 of this Act." Ill. Rev. Stat. 1989, ch. 38, par. 104—16(a).

Section 104—21 states in pertinent part:

"A defendant who is receiving psychotropic drugs or other medications under medical direction is entitled to a hearing on the issue of his fitness while under medication." Ill. Rev. Stat. 1989, ch. 38, par. 104—21(a).

■ In the present case, no *bona fide* doubt as to defendant's fitness was raised. Although the trial court ordered a fitness examination, it did so only after the State requested that one be conducted, subsequent to defendant's voluntarily admitting himself to a hospital for psychiatric treatment the day before his trial was originally scheduled to begin. Defendant was subsequently examined, and the trial court received a written report several weeks before the trial actually commenced. The report signed by Doctor Kaplan stated that defendant was fit to stand trial with medication. At no time during the proceedings did defendant challenge the doctor's finding or advise the court that he had failed to take his medication. Furthermore, there was no medical testimony that defendant's fitness for trial could only be maintained by the continued use of prescribed medication, since neither party requested a hearing on defendant's fitness prior to this appeal. (See *People v. Brown* (1992), 239 Ill. App. 3d 1077, 608 N.E.2d 67.) In addition, defendant did not request such a hearing in his post-trial motion, and thus has waived this issue on appeal. Nevertheless, we shall consider the issue.

Our review of the record reveals no facts which would have

prompted the court *sua sponte* to inquire as to defendant's mental or physical condition or as to whether he was taking his medication. In fact, when the court ordered the BCX for defendant, it commented that it had observed defendant over the past year and could not discern anything from either his appearance or his statements that would indicate the likelihood of the presence of a mental disease, or any other problem that could be verified or that would serve as a basis for the court to order or the State to suggest that such an examination be conducted. More importantly, defendant testified at trial, during which time the court observed nothing about his appearance or testimony that would suggest his incompetence. We therefore find that the trial court did not abuse its discretion when it found that there was no *bona fide* doubt as to defendant's fitness and, consequently, did not order a fitness hearing prior to trial.

■ With regard to the sufficiency of the report, we note that defendant again failed to raise the issue of its alleged insufficiency at trial or in his post-trial motion and, in doing so, has waived this issue for review. We find, however, that the report did satisfy the statute and was not merely conclusory. The report, dated March 19, 1991, the day after the Psychiatric Institute performed the examination on defendant, indicated, in addition to the fact that defendant was fit to stand trial with medication, that he understood the nature of the charge pending against him and the purpose of the proceedings. In addition, he was evaluated as being able to cooperate with counsel in preparing his defense. The report also related that when examined, defendant was neatly dressed, well-groomed, oriented, coherent, alert and showed no signs of confusion or memory problems. Furthermore, defendant denied having psychotic problems. In Doctor Kaplan's opinion, defendant was legally sane and able to appreciate the criminality of his alleged offenses and was able to conform his conduct to the law. We find that the report complied with the statute.

For the reasons stated, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

RAKOWSKI and GIANNIS, JJ., concur.