SIXTH DIVISION

APRIL 17, 1998

No. 1-96-4232

THE PEOPLE OF THE STATE OF ILLINOIS, ) APPEAL FROM THE

) CIRCUIT COURT

Plaintiff-Appellee, ) OF COOK COUNTY.

)

v. )

)

ROBERT ORNELAS, ) HONORABLE

) RALPH REYNA,

Defendant-Appellant. ) JUDGE PRESIDING.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Following a bench trial in the circuit court of Cook County, defendant Robert Ornelas was found guilty of first degree murder and sentenced to natural life imprisonment in the Illinois De­partment of Corrections.  Defendant appeals his conviction.

The record on appeal indicates that prior to trial, defen­dant filed a motion to quash his arrest.  During a hearing on the matter, Frankfort Police Officer Robert Piscia testified that on November 15, 1990, at approximately 7:30 a.m., he spoke to four men standing around the parking lot of the White Hen at LaGrange Road and Route 30.  Illinois State Trooper Kim Hoffman-Davis testified that at approximately 8:20 a.m., she was at a gas station near Routes 30 and 45 in Tinley Park, Illinois, when a citizen informed her that a fight was in progress at the White Hen.  

Trooper Hoffman-Davis went to the White Hen, where she saw four men standing in the parking lot.  Trooper Hoffman-Davis made a radio call regarding the reported fight.  Trooper Hoffman-Davis testified that she believed that she noted that she did not see an ongoing fight.  Trooper Hoffman-Davis asked the men for iden­tifica­tion; three of the men had identification, but defendant did not.  Trooper Hoffman-Davis asked defendant his name; defen­dant first said his name was Ornelas, then said he was named Rudy Ramos.

Approximately two or three minutes later, Illinois State Trooper Charles Arceneux arrived on the scene.  Trooper Arceneux testified that the four men would just stare and appeared inco­herent when posed with a question.  The men did not appear nor­mal; based on his experience, Trooper Arceneux assumed some drug other than alcohol was at work, because there was no alcohol smell.

Trooper Hoffman-Davis asked the men to empty their pockets.  The men produced a pair of brass knuckles, 21 hits of LSD and a vial of PCP.  However, none of these items were produced by defen­dant.

At this point, according to Trooper Hoffman-Davis, the Frank­fort Police arrived on the scene.  Officer Piscia testified that he had returned to the scene in response to a radio call.  Officer Piscia stated that another Frankfort Police car appeared on the scene to transport the men to the police station, because the Frankfort cars -- unlike the State Police cars -- had safety cages.  Officer Piscia stated that the emotions of the four men would vary from excited to lethargic.  

Officer Piscia transported two of the men to the police station in his car.  One of the men claimed to be a devil, then claimed to be Jesus Christ and forgave Officer Piscia for his sins.  Officer Piscia did not recall which of the men made these claims.  Trooper Hoffman-Davis testified that after arriving at the police station, defendant was screaming in his cell, where he had fash­ioned a cross on the door.  According to Trooper Hoffman-Davis, defendant claimed he was Jesus Christ, but also identified himself as Joe Montana.  Trooper Hoffman-Davis testified that the Frankfort Police summoned paramedics to the police station be­cause the men apparently ingested drugs; although the police believed one of the drugs was LSD, they did not know what the vial of liquid contained at that time.

Peter Hwang testified that he was a Special Agent for the Illinois State Police, Division of Criminal Investigations.  On November 15, 1990, Special Agent Hwang went to the Frankfort Police station regarding a narcotics investigation.  After speak­ing with Trooper Hoffman-Davis, Special Agent Hwang spoke to the individuals at the police station.  Special Agent Hwang spoke to William Luedtke, after obtaining a written waiver of 
Miranda
 rights.  According to Special Agent Hwang, Luedtke appeared to be under the influence of "something," but also understood every­thing Special Agent Hwang said.  Luedtke told Special Agent Hwang that defen­dant's name was Bobby Ornelas, not "Rudy Ramos."

Luedtke also told Special Agent Hwang that defendant had been involved in a double homicide on the south side of Chicago two nights earlier.  Luedtke stated that defendant had spoken of killing two people with a shotgun near a party to which defendant had been denied admittance.

Special Agent Hwang telephoned the Chicago Police Depart­ment, Area 2 Violent Crimes.  Special Agent Hwang was informed that the Chicago Police were looking for Robert Ornelas in con­nection with the investigation of a double homicide.  Special Agent Hwang was also informed that Area 2 detectives would be sent.  

At approximately 11 to 11:30 a.m., Special Agent Hwang spoke to defendant, who was handcuffed to the wall of an interview room.  Defendant confirmed that he was also named Ornelas.  In Special Agent Hwang's opinion, defendant appeared "a little confused" and under the influence of narcotics at the time.  Special Agent Hwang told defendant that he would take defendant to the Illinois State Police station in Joliet and that the Chicago Police Department was coming to talk to him.

Special Agent Hwang then transported defendant to the Illi­nois State Police District 5 headquarters in Romeoville.  After a conversation with defendant, Special Agent Hwang went to lunch.  Defendant was handcuffed to a chair in an interview room.

Two Chicago Police Detectives arrived at approximately 3 p.m.  After the detectives spoke with defendant, they accompanied Special Agent Hwang to the Will County Jail, where the police obtained a written waiver of 
Miranda
 rights and a written state­ment from Luedtke.  Special Agent Hwang stated that Luedtke was not under medical care at the time and appeared to be fine.

The police later returned to District 5 headquarters; at trial, the time was established as approximately 5 p.m.  Chicago Police Detective Steven Brownfield, who was involved in the investigation of the double homicide and the questioning of defen­dant, testified that defendant was orally notified of his 
Miranda
 rights.  Detective Brownfield testified that defendant admitted to the double murder, at which time he was arrested and charged with the offense.

The trial court denied the motion to quash arrest.  Although the trial court did not rule on the legality of defendant's initial arrest, the court held that the arrest for murder was not an extension of the initial arrest.  The trial court also held that there had been probable cause to arrest defendant for mur­der.

Defendant also filed a motion to suppress his statement to the police.  The trial court denied this motion, ruling that defendant was coherent at the time he made the statement, which the court held to be voluntary.

At trial, Scott Byron testified that on November 11, 1990, he attended a party near 104th and Calhoun.  Between 11 and 11:30 p.m., Byron heard what sounded like a gunshot or a gun back­firing.  Byron admitted that in 1991, he had been convicted of burglary to an automobile and sentenced to probation.

Chicago Police Officer John Boitch testified that at approx­imately midnight on the night in question, he received a call reporting a vehicle theft.  While responding to this call, he received another call reporting persons possibly shot in a car, approximately one and one-half blocks from the first location.  Upon arriving at the scene approximately two minutes later, Officer Boitch observed an automobile with a shattered window leaning against a fence.  The steering column was peeled; there were no keys in the car.

Officer Boitch observed two bodies in the car, later identi­fied as Joy Mosqueda and Robert Cheeks; one had been shot in the face, the other in the neck.  The car's transmission appeared to be set to drive.  Officer Boitch also saw two spent shotgun shells on the ground.  Dr. Mitra Kalelkar, a forensic pathologist who had been employed by the Cook County Medical Examiner's Office, testi­fied her post-mortem examination of the bodies showed that Mosqueda died from a shotgun wound to the face and Cheeks died of multiple shotgun wounds.

Chicago Police Detective James Boylan testified that he was assigned to investigate the double homicide.  Detective Boylan testified that he spoke with Dion Castillo, who attended the aforementioned party near 104th and Calhoun.  According to Detec­tive Boylan, Castillo stated that defendant came to the door of the party, but was not admitted.  Detective Boylan testified that Castillo had told him that defendant had a gun that he fired before he left, at approximately 11:45 p.m.  Castillo testified that she had not seen defendant on the day at issue.  Castillo thought she had told Detective Boylan that she had not been at the party at the time these events supposedly occurred and that she was relaying hearsay to the detective.

William Luedtke testified that defendant came to his house at approximately 11:30 p.m. on November 11, 1990.  Luedtke stated that defendant seemed nervous and edgy.  The next day, defendant told Luedtke that he was wanted for a double homicide he commit­ted in Chicago.  According to Luedtke, defendant said that he was under the influence of LSD the previous night and "blew off a round" in the backyard after he was denied admittance to the party.  Luedtke testified that defendant had said that while he was walking home, "there were two guys in a car, and they were looking for trouble, and he proceeded to shoot them both" with a sawed-off shotgun.  According to Luedtke, defendant stated that there was a look of fear on the victims' faces before he shot them.

Special Agent Hwang gave testimony that was substantively similar to his testimony at the hearing on the motion to quash arrest.  Special Agent Hwang added that when the detectives spoke with defendant at approximately 3 p.m., defendant claimed he had been with a woman named Dawn in Chicago Heights on the night in question, but could not remember the exact address.  When the police again questioned defendant after speaking with Luedtke, defendant gave a statement admitting the offense, explaining that he was a member of the Vice Lords and that the victims were members of the King Cobras.  Defendant claimed he shot at the automobile twice with a shotgun in self-defense.

Detective Mike Gerhardstein testified that in November 1990, he was on a leave of absence and was serving as an Assistant State's Attorney.  Detective Gerhardstein took a lengthier writ­ten statement from defendant on November 15, 1990.  Detective Gerhard­stein read the statement into the record.  

In the statement, defendant admitted firing his 12-gauge shotgun in a backyard after being denied entrance to the party near 104th and Calhoun.  Later, as defendant walked down an alley between Bensley and Calhoun, defendant saw Jay Mosqueda and "a black guy" in an automobile.  Defendant stated that Mosqueda used to beat defendant when they were both young.  Defendant knew that Mosqueda was a member of the King Cobras, whereas he was a Vice Lord.  Defendant thought that Mosqueda and Cheeks were going to run over defendant in their automobile.  Defendant and Mosqueda yelled at each other, though defendant could not remember what was said.  Defendant fired his shotgun through the passenger side window, hitting Mosqueda in the face.  Cheeks said something; defendant fired at him also.  Defendant then ran, destroyed the shotgun and walked to Whiting, Indiana to hide with friends.

Assistant Public Defender Crystal Marchigiani testified that she interviewed Luedtke in April 1994.  According to Assistant Public Defender Marchigiani, Luedtke stated that in November 1990, the police told him they could not help him with the nar­cotics charge and that he would be charged as an accessory after the fact to the double homicide if he did not talk.  Defendant maintains that Luedtke and the two others who were in the White Hen parking lot with him were charged with possession of contra­band in Will County, but that their motions to quash arrest and suppress evi­dence were granted, though the citation in defen­dant's brief does not directly support this contention.

It was stipulated that at approximately 12:05 a.m. on Novem­ber 11, 1990, Roy Medrano called 911 to report that his car was stolen by two offenders that Medrano thought to be armed.  It was stipu­lated that police evidence technicians found no guns or knives in the automobile or on the victims.  The parties also stipulated to the prior criminal records of Mosqueda and Cheeks.

The trial judge found defendant guilty of the first degree murder of Mosqueda and Cheeks.  The trial court denied defen­dant's post-trial motions and sentenced defendant to natural life impris­onment.  Defendant now appeals.

I

Defendant contends that the trial court erred in denying the motion to quash his arrest, arguing that the police initially lacked probable cause to detain him and the State failed to show that his statements to the police were sufficiently attenuated from the illegal arrest.  The State, like the trial court, does not address the legality of defendant's initial arrest.  Rather, the State argues that there was probable cause to arrest defen­dant for the double murder and that such arrest is attenuated from the initial arrest.  Thus, we address the issue of attenua­tion.

This court will not disturb a trial court's decision on a motion to quash and suppress unless that decision is determined to be clearly erroneous.  
People v. Foskey
, 136 Ill. 2d 66, 76, 554 N.E.2d 192, 197 (1990).  However, when neither the facts nor the credibility of witnesses is questioned, and the issue is a question of law, this court reviews 
de novo
.  See 
Foskey
, 136 Ill. 2d at 76, 554 N.E.2d at 197.

The law rejects a simple "but for" test under which any statement by a defendant following an unlawful arrest must be suppressed on the ground that the statement would not have been made had he not been taken into custody.  See 
People v. Gabbard
, 78 Ill. 2d 88, 95, 398 N.E.2d 574, 577 (1979)(and cases cited there­in).  A motion to quash and suppress will be granted where the evidence shows a causal connection between the illegal arrest and the statement such that the statement could be said to have been obtained by exploitation of the illegality.  See 
Gabbard
, 78 Ill. 2d at 95, 398 N.E.2d at 577.  The question of whether defen­dant's statement was obtained by means sufficient to cleanse the taint of the illegal arrest depends on the facts of each case.  
Brown v. Illinois
, 422 U.S. 590, 603-04, 95 S. Ct. 2254, 2261, 45 L. Ed. 2d 416, 427 (1975).  The factors to be considered in deciding this question are: (1) the presence or absence of 
Miran­da
 warnings; (2) the "temporal proximity" of the arrest and the confession; (3) the presence or absence of intervening circumstances; and (4) the purpose of the official misconduct.  
Brown
, 422 U.S. at 603-04, 95 S. Ct. at 2261-62, 45 L. Ed. 2d at 427 (1975).  The State bears the burden of demonstrating attenua­tion.  
Foskey
, 136 Ill. 2d at 86, 554 N.E.2d at 202.

In this case, defendant makes no claim that he was not proper­ly given 
Miranda
 warnings when questioned by the police.  Defendant first identified himself as Ornelas prior to the ini­tial arrest.  The record shows that defendant was at the Frank­fort police station by 9 or 9:15 a.m., which suggests that he was arrested between 8:30 a.m. and 9 a.m.  Defendant attempted to give an alibi to police who questioned him in the afternoon, but confessed to the double murder at approximately 5 p.m., eight hours after his arrest.  This lapse of time alone would not dissipate the illegality of an arrest, but is to be considered.  See, 
e.g.
, 
People v. Dale
, 189 Ill. App. 3d 704, 722-23, 545 N.E.2d 521, 533 (1989).

The third factor -- the presence or absence of intervening circumstances -- requires more analysis than the first two fac­tors in this case.  The State argues that confronting defendant with Luedtke's statement after it was partially corroborated by the Chicago Police Department is an intervening event which creates attenuation from the original arrest.  Although interven­ing prob­able cause does not assure in every case that an illegal arrest has not been unduly exploited, it is an important factor in the analy­sis of attenuation.  
People v.  Pierson
, 166 Ill. App. 3d 558, 519 N.E.2d 1185 (1988).

In this case, we note that Luedtke was in custody and did not implicate himself in the double murder.  These factors could cast suspicion on the reliability of Luedtke's statement.  How­ever, the record here shows that Special Agent Hwang confirmed with the Chicago Police Department that defendant was wanted for questioning regarding the double murder.  A partially corroborat­ed statement of someone who would not be presumed credible (
e.g.
, an accomplice or paid informant) can establish probable cause for arrest.  See, 
e.g.
, 
People v. James
, 118 Ill. 2d 214, 222-24, 514 N.E.2d 998, 1002 (1987).

Inexplicably, defendant's initial brief did not expressly address the impact of Luedtke's statement on the issues of prob­able cause and attenuation.  However, defendant has sought leave to rely on two recent decisions of this court that have reversed the denial of motions to quash and suppress where the intervening event is the confrontation of the defendant with the statement of an illegally arrested co-offender.  
E.g.
, 
People v. Austin
, No. 1-96-2864 (1st Dist. 6th Div., Nov. 26, 1997); 
People v. Beamon
, 255 Ill. App. 3d 63, 627 N.E.2d 316 (1993)(State's use of evi­dence obtained as a result of the illegal arrest of a codefendant may not serve to attenuate the taint of defendant's illegal arrest).
(footnote: 1)  
Austin
 is of particular interest because it involved confronting the defendant with statements from two co-offenders, Gamble Dorrough and Bobby Walley, and a statement from a man named Kevin Taylor, who impli­cated Dorrough, Walley and defendant in a homicide.  The trial court held that defendant, Dorrough and Walley were illegally arrested, but that their statements were attenuated because Taylor was not illegally arrested and it was his statement that caused Dorrough to make a statement; the two statements caused Walley to make a statement; the three state­ments caused defendant to make a statement.

This court reversed and remanded, holding that defendant's statement was not attenuated from his unlawful arrest.  This court noted that "[d]espite the fact that the record suggested that Taylor was taken to the police station in the same manner as the other men, the trial court refused to find that Taylor had been illegally arrested."  
Austin
, slip op. at 8.  However, 
Austin
 does not state that the trial court's ruling on this point was erron­eous.  In a concurring opinion, Justice Quinn, noting a factual similarity to 
Pierson
, wrote that had defendant been confronted solely by Taylor's statement (which implicated defen­dant but not Taylor), the arrest would have been attenuated.  
Austin
, slip op. at 16-17 (Quinn, J., specially concurring).

In reviewing the 
Pierson
 and 
Austin
 opinions, as well as the cases upon which those opinions rely, it is clear that interven­ing probable cause will not attenuate an illegal arrest in every case.  However, the 
Austin
 line of cases do not hold that inter­vening probable cause will 
never
 attenuate an illegal arrest.  Rather, cases such as 
Pierson
 and 
Austin
 may reach different results because they are merely specific examples of the case-by-case analysis this court is required to undertake pursuant to Supreme Court opinions such as 
Brown
.

In our view, the difference in outcome shown in cases such as 
Pierson
 and 
Austin
 are due to the fourth factor of the 
Brown
 analysis, 
i.e.
 -- the purpose and flagrancy of the official miscon­duct.  Our supreme court has yet to rule in a case with facts similar to this one.  Nevertheless, a review of the supreme court's opinion in 
Gabbard
 reveals similarities to this case.

In 
Gabbard
, the defendant was unlawfully arrested while walking along the shoulder of a road and later gave an inculpa­tory statement regarding a robbery.  The 
Gabbard
 court neverthe­less stated as follows:

"The unlawful arrest of the defendant was *** not made in the course of an investi­gation into the robbery or for the purpose of interro­gating the defendant on that subject.  Neither the arresting officer nor the govern­mental entity by which he was employed was inves­tigat­ing that crime or was responsible for doing so, and the arresting officer was not even aware that it had occurred.  The interrogating offi­cer, on the other hand, knew that the defendant was in custody as the result of having escaped from an institution, and while also aware that the defendant had been found in possession of articles stolen in the robbery, he did not know the circum­stances leading to the defendant's arrest.  We are not presented here with an attempt by police to avoid responsibility by dividing it among different individuals. ***  In the present case the purpose of the exclus­ionary rule, 
i.e.
, to deter improper police conduct ***, would be served minimally, if at all, by exclusion of the defendant's state­ments."  
Gabbard
, 78 Ill. 2d at 98-99, 398 N.E.2d at 578-79.

The 
Gabbard
 court then noted that the evidence showed that the defendant's statements were prompted by intervening events, such as being shown a sketch that defendant acknowledged resembled him and that was prepared prior to his arrest.  
Gabbard
, 78 Ill. 2d at 99, 398 N.E.2d at 579.  Accordingly, the supreme court af­firmed the appellate court's decision that defendant's statements were admis­sible.  See also 
People v. Malloy
, 104 Ill. App. 3d 605, 607-08, 432 N.E.2d 1291, 1293 (1982).

In this case, the record shows that the arresting officers had no knowledge of the double murder investigation in Chicago.  Nor did Special Agent Hwang, who questioned Luedtke, have any such information prior to Luedtke volunteering it.  

In contrast, the record shows that when Chicago Police Detec­tive Steven Brownfield became involved in the investigation of the double homicide, he learned that defendant was wanted for question­ing based on evidence that defendant had been armed with a shotgun and had fired that shotgun near the location of the double murder within minutes of that shooting.  Detective Brown­field also testi­fied that prior to November 15, 1990, the police had searched defendant's home, where several shotguns and barrels were discovered.  Thus, the Chicago Police Department had already gathered significant evidence incriminating the defendant prior to and independent of his arrest in the White Hen parking lot.  Moreover, there is no evidence that the Chicago Police Department was aware of the circumstances of defendant's arrest.  These aspects of the case are similar to those in 
Gabbard
.

However, the fact that the statement implicating defendant was not made by defendant, which was not present in 
Gabbard
, raises additional concerns, such as whether Luedtke's statement should be considered tainted by an illegal arrest and, if so, whether an illegal arrest defeats a finding of intervening prob­able cause.  Although defendant does not expressly claim that Luedtke was illegally arrested, he does claim that the circuit court of Will County granted motions to quash and suppress filed by the three other men.  The citation to a transcript of proceed­ings supplied by defendant shows that the trial court here admit­ted orders of the circuit court of Will County as evidence, but does not expressly state the contents of the orders.  The tran­script also contains closing argument in which defense counsel states that the State's Attorney moved for 
nolle prosequi
 as to Luedtke on the ground of collateral estoppel after a motion to quash and suppress was granted as to one of the other men.  Yet defendant fails to identi­fy where the underlying orders and motions appear in this record.  This court hesitates to conclude that Luedtke's arrest was illegal, particularly given the fact that Luedtke testified for the State in this case, which suggests another reason why charges against him may have been dropped.

Fortunately, in this case, we need not reach a conclusion regarding the legality of Luedtke's arrest.  Assuming 
arguendo
 that Luedtke was illegally arrested, this case remains distin­guishable from cases such as 
Beamon
 and 
Austin
.  In those cases, an illegally arrested informant or informants implicated the defendant in the offense for which both were arrested.  In this case, Luedtke was not arrested in connection with the double murder.  Thus, Luedtke's statement is similar to the information provided in 
Pierson
.  

Defendant correctly notes that Luedtke might not have made the statement had he not been in police custody.  However, such an argument cannot rest on a "but for" analysis that has been held improper.  The possibility that Luedtke might have volunteered the statement to obtain favorable treatment is rele­vant, but not determinative.  

We hasten to add that the fact that Luedtke and defendant were not arrested for the double murder is similarly not determi­native.  It is possible to imagine a hypothetical case where the flagrancy and improper purpose of the police is such that an arrest initially based on a seemingly unrelated illegal arrest must be quashed.  In this case, however, the arresting officers could not have exploited the arrests to obtain Luedtke's state­ment relating to a crime of which the arresting officers were unaware.  Moreover, the record supports the conclusion that the police did not arrest the four men for the purpose of gaining evidence of unrelated offenses.

In sum, defendant was given 
Miranda
 warnings, but did not confess for eight hours -- after he was confronted with Luedtke's statement.  Given this record, the police do not appear to have engaged in flagrant misconduct.  The benefit to be derived from enforcing the exclusionary rule in this case seems minimal.  Thus, the trial court's determination that defendant's arrest for murder was attenuated from the initial arrest is not manifestly erroneous.

II

 Defendant also contends that he was not proved guilty beyond a reasonable doubt because he acted in self-defense.  The standard for reviewing a conviction that is challenged on the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any ration­al trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
People v. Dent
, 230 Ill. App. 3d 238, 242, 595 N.E.2d 18, 21 (1992).  Once a defendant has been found guilty of a crime, the fact finder's role as weigher of the evidence is preserved through a legal conclusion.  
Dent
, 230 Ill. App. 3d at 242, 595 N.E.2d at 21.  On review, this court will not reverse a criminal conviction unless the evidence is so improb­able or unsatisfactory that a reasonable doubt of defen­dant's guilt is justified.  
People v. Moore
, 171 Ill. 2d 74, 94, 662 N.E.2d 1215, 1224 (1996).

Self-defense is an affirmative defense to the charge of murder.  When raised by defendant with some evidence, the State has the burden of proving that defendant is guilty beyond a reasonable doubt.  
People v. Rogers
, 263 Ill. App. 3d 120, 126, 635 N.E.2d 889, 894 (1994).  Whether a killing is justified under the law of self-defense is a question of fact to be decided by the trier of fact.  
People v. Turcios
, 228 Ill. App. 3d 583, 594, 593 N.E.2d 907, 915 (1992).  Unless the record raises serious questions regarding the trier of fact's finding on self-defense, it should not be disturbed by a reviewing court.  
Turcios
, 228 Ill. App. 3d at 594-95, 593 N.E.2d at 915.

In this case, the record does not raise serious questions regarding the trial court's rejection of the claim of self-de­fense.  Luedtke's testimony regarding defendant's statement to him does not mention any threat of bodily harm to defendant by the victims.  More­over, in his statement to the police, defendant first claimed that he thought the victims were going to run him over in their car, but then stated that he first had an argument with one of the vic­tims before firing his gun.  The record indi­cates that the victims were shot at close range from the side of the car.  Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have concluded that defendant did not act in self-defense.

For all of the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

ZWICK, J., and QUINN, J., concur.

FOOTNOTES
1:  
Austin
 and 
Beamon
 also hold that a defendant can contest the legality of an accomplice's arrest, which is a question of some controversy.  See 
Austin
, 1-96-2864 (Quinn, J., specially concur­ring).  Justice Quinn noted that our supreme court has held that probable cause to arrest may be based on the statement of an illegally arrested codefendant (see 
People v. James
, 118 Ill. 2d 214, 222-24, 514 N.E.2d 998, 1002 (1987)), but 
Beamon
 held with­out citation that a different rule applies to attenuation.  However, this controversy need not be revisited in this case, based on the record on appeal.